[No. 10371-7-I. Division One. May 31, 1983.]

GENE MORGAN, *Appellant*, v. STOKELY-VAN CAMP, INC., *Respondent*.

*Paul Reilly,* for appellant.

*Stanley K. Bruhn* and *Bannister, Bruhn, Cuningham & Clark,* for respondent.

CALLOW, J.—Plaintiff Gene Morgan appeals a trial court judgment which found defendant Stokely–Van Camp, Inc., not liable for payment for 27 acres of Morgan's peas. The sole issue is whether the trial court erred when it admitted evidence extrinsic to the written contract.

In 1976, Gene Morgan, a Skagit County farmer, entered into a written contract (Morgan–Stokely contract) with Stokely–Van Camp, Inc., whereby Stokely agreed to purchase 336 acres of peas being grown by Morgan. The Morgan–Stokely contract was a form contract with a yearly "rider" attached specifying the variety of peas, acreage per variety, and the price schedule. That year, Stokely harvested only 301 acres of Morgan's peas. Morgan filed suit alleging that Stokely had bypassed 37 acres of his peas and had failed to pay him for the bypassed peas. Of the 37 acres in dispute, only 27 acres are relevant to this appeal.

The discrepancy between the 336 acres contracted for and the 301 acres harvested was not unusual. Testimony was admitted on the parties' course of dealing from 1973 to 1977. Except for the year 1977, the acres of peas harvested by Stokely usually differed from the acres contracted for. The difference between the two figures was due to the method by which Stokely contracted for the peas. Although the contract amount is expressed in terms of acres, the farmer is paid by the tonnage of peas harvested. Stokely arrived at the proposed contract figure by estimating the

yield of peas per acre of land. Then the farmers would look at the counter on their seed drill to find out how many acres of peas were actually planted. That figure would be submitted to Stokely as the final contract figure. There was ample testimony on the custom and usage between the farmers and processors in regard to the amount of acres contracted for and the amount harvested and paid for. Following is an excerpt of certain testimonies of Stokely employees—Elmer Overway, field superintendent, Bob Roedell, field man, and Clyde Miller, operations manager.

[Elmer Overway]

Q With regard to this trade and custom and usage we just talked about, you said the acreage would vary from the contract either plus or minus. Was it a common practice in the area to initial or amend the contract in writing?

A I have never seen it done, never have gone back with the contract.

Q Has Stokely experienced any problems with farmers in that regard?

A Never have.

. . .

[Bob Roedell]

Q Isn't it a fact that you didn't really contract a field. You were just contracting a total number of acres; isn't that what you do?

A Only when they give us an amount, oh, a large grower like that. The amount of acres is what we are after, yes, but when it comes to planting—

Q What I am asking you is did you contract for acres? Do you contract for fields? It is acres, isn't it?

A Under the approval that the field will meet our specs, yes.

Q Do you recall your deposition taken on June 24, 1980, page 10. I want you to look there on lines 16 and 17 where you say, "Here again we contract acres but we pay by the ton." Is that what you said on that day?

A Yes, that's a true statement.

. . .

[Clyde Miller]

Q Mr. Miller, do your records, Stokely records reflect whether or not the acres harvested, planted and har-

vested for Mr. Morgan in any of the years that he was under contract, did they vary from the written number of acres shown?

A Yes, in the five years we contracted with Mr. Morgan, 1977 was the only year where it came out even, the acres contracted versus the acres harvested.

Q Do you recall how the years ran?

. . .

A In 1977, the acres harvested were 197.

Q Which year?

A 1973, and contracted were 200, the net difference is minus three. We contracted three more than we harvested. In 1974 the acres harvested was 346. Three hundred sixteen were contracted. That is plus 30 we harvested, 30 more than we contracted that year. In 1975 the acres harvested were 362. The acres contracted were 374. That is a net result of minus 12. We harvested 12 acres less than we contracted. . . . In 1977, it came out even.

Q Were any of those contracts for those years you have talked about amended in writing?

A No.

Q Any notes or marks on them?

A No. I point out that in 1977 there were 67 acres contracted. That is a small amount so it is much more logical that we would come out even. When you are dealing in larger numbers, . . . you have much more room for diverging from the original.

The 27 acres of peas involved in this appeal were grown on a parcel of land commonly known as the "Wallace field." The first year in which Morgan farmed the Wallace field was 1976. Whenever a farmer wished to farm a new field, Stokely would check the new field before planting to ensure that the field was suitable for their purposes. Morgan claims that Stokely knew of his plan to include the Wallace field in his contract figure of 336 acres. On the other hand, Stokely denies assenting to Morgan's plans. Stokely claims that after they checked the field, they informed Morgan that the field was unsuitable for Stokely's purposes and that Morgan acknowledged the unsuitability and offered to find other acreage to complete the total contract figure but would nonetheless go ahead with his plan to cultivate the

Wallace field; if the peas matured on time, Stokely agreed to harvest the peas.

The peas on the Wallace field matured 10 days after Stokely had harvested Morgan's other acres of peas. Stokely never harvested or swathed the Wallace field since the peas did not mature until Stokely had moved its harvesting operation to another area.

The trial court found that the parties had a different agreement with respect to the Wallace field than that expressed in the written contract; that the risk of loss was upon Morgan; and because the Wallace field failed to mature at the same time as Morgan's other fields, Morgan assumed the risk of loss. Stokely was held not liable or responsible for the Wallace field.

The Morgan–Stokely contract is governed by the Uniform Commercial Code. Goods, as defined by the U.C.C., include "the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty". RCW 62A.2–105.

> (2) A contract for the sale apart from the land of growing crops . . . capable of severance without material harm [to the realty] is a contract for the sale of goods within this Article . . .

RCW 62A.2–107. Accordingly, the parol evidence rule of the U.C.C., RCW 62A.2–202, applies and is as follows:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (a) by course of dealing or usage of trade (RCW 62A.1–205) or by course of performance (RCW 62A.2–208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Pursuant to U.C.C. § 2–202,

> If the confirming memoranda of each party agree on a term, that term cannot be contradicted. The "final expression" rule is more difficult. Terms cannot be contradicted if the writings were intended to be the final expression of the parties' agreement. *All* evidence is admissible and may be considered by the court in making this finality determination. *See Interform Company v. Mitchell,* 575 F.2d 1270 (9th Cir. 1978). Whether the finality requirement is met is a question of fact to be determined under the circumstances of the case.

Washington State Bar Ass'n, *Commercial Law Deskbook* § 4.3(2)(a) (1982).

The language in the contract which Morgan relies on for his assertion that the Morgan–Stokely contract was a fully integrated agreement states that "[t]his constitutes the whole agreement between the parties hereto and no representation, oral or written, shall be binding upon either of the parties hereto unless contained herein." Morgan asserts that this "merger clause" language precluded the trial court from looking outside the written contract to interpret the contract. Morgan cites *Black v. Evergreen Land Developers, Inc.,* 75 Wn.2d 241, 450 P.2d 470 (1969), as authority for his premise that merger clauses are conclusive in the absence of fraud. Morgan claims that because fraud was not involved in the Morgan–Stokely contract, the merger clause conclusively precludes the admission of extrinsic evidence. However, the *Black* court used parol evidence to determine whether the agreement was the true and final expression of the parties' agreement.[1] The court held, *after* reviewing extrinsic evidence, that it was obvious the clause was false and therefore the court declined to adhere to it. "Under the law of this jurisdiction 'a party to a contract is not bound by a false recital of fact, and parol evidence is admissible to show the true state of affairs.'" *Black,* at 250 (quoting *Cook*

---

[1] The earnest money agreement in *Black* contained the following in standardized fine print: "'There are no verbal or other agreements which modify or affect this agreement.'" *Black v. Evergreen Land Developers, Inc.,* 75 Wn.2d 241, 250, 450 P.2d 470 (1969).

*v. Vennigerholz,* 44 Wn.2d 612, 616–17, 269 P.2d 824 (1954)).

■ In the absence of accident, fraud, or mistake, parol evidence is not admissible for the purpose of contradicting, subtracting from, adding to, or varying the terms of an unambiguous contract. *Fleetham v. Schneekloth,* 52 Wn.2d 176, 179, 324 P.2d 429 (1958).

However,

> The mere fact that a written contract is complete upon its face is not alone decisive of whether the writing is the integrated agreement of the parties so as to prevent so-called parol evidence of different or additional terms and agreements. Rather, there could still be a factual inquiry concerning the intent of the parties on this point. The relative completeness of the document would be a factor for consideration along with evidence of all the surrounding circumstances including the alleged oral agreement and the conduct of the parties.

5A K. Tegland, Wash. Prac. § 524, at 412 (2d ed. 1982).

Thus,

> in every case in which a proponent wishes to prove other terms—contradictory or not—the court should first hear offered evidence and determine whether the written agreement was intended to be the final integration of all previous and contemporaneous dealings upon the subject matter. If so, the terms and agreements not embodied in the writing are to be disregarded. If not, then the writing may be supplemented or replaced by other terms or agreements which the evidence shows by a preponderance of evidence.

5 R. Meisenholder, Wash. Prac. § 121, at 125 (1965).

> Although completeness of the written contract should always be taken into account . . . the intent of the parties is the basic test—not merely and only the completeness of the written contract upon its face.

5 R. Meisenholder, Wash. Prac. § 121, at 63 (Supp. 1979).

*Diel v. Beekman,* 1 Wn. App. 874, 879, 465 P.2d 212 (1970) held that

> the legal basis for the parol evidence rule is the theory of integration. A writing *intended* to supersede earlier and

contemporaneous expressions is given that effect. This does not mean, however, that simply because there is a written agreement, other evidence will not be considered as a preliminary matter.

The parol evidence rule is not one of evidence but of substantive law. The rule is not an exclusionary rule of evidence. *Barber v. Rochester,* 52 Wn.2d 691, 697, 328 P.2d 711 (1958). The trial court must first hear all extrinsic evidence to determine whether the parties intended the contract to be the final expression of their agreement before it can apply the parol evidence rule. *International Harvester Co. v. Bank of Cal., N.A.,* 29 Wn. App. 905, 909, 632 P.2d 522 (1981). Whether the parties intended the written contract to be the sole agreement is a question of fact.

> People have the right to make their agreements partly oral and partly in writing, or entirely oral or entirely in writing; and it is the court's duty to ascertain from all relevant, extrinsic evidence, either oral or written, whether the entire agreement has been incorporated in the writing or not. That is a question of fact.

*Barber v. Rochester, supra* at 698. If, after hearing all extrinsic evidence, the court determines that the written agreement is a complete integration, the written agreement stands and the parol evidence is disregarded. On the other hand, if the court determines that the written contract was not the final expression of the parties' agreement, then the written contract is "replaced or supplemented by the preponderate terms of the parol agreement." *Diel v. Beekman, supra* at 880.

■ Extrinsic evidence is also admissible to establish trade usage even though the words used in their ordinary or legal sense are unambiguous. *Stender v. Twin City Foods, Inc.,* 82 Wn.2d 250, 510 P.2d 221 (1973).

> If a written contract has come into existence which represents the final agreement of the parties but not necessarily their *entire* agreement, the UCC recognizes three external sources which may be used to add to or clarify explicit terms in the contract and also to add a term as to which the contract is otherwise silent. These

sources are course of performance, course of dealing, and usage of trade.

*Commercial Law Deskbook,* at § 5.4. Course of dealing refers to dealings between the same parties but is not restricted to dealings with a particular contract. Course of dealing is defined as

a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

RCW 62A.1–205(1). *Commercial Law Deskbook* discusses course of dealing at section 5.4(2) and states that "[c]ourse of dealing is used most frequently to clarify or perhaps alter the meaning of terms used in a contract. Within this contest [*sic*] it is not necessary that the written agreement itself disclose any ambiguity."

Usage of trade need not have any relationship to either party or to the contract involved in the dispute. Usage of trade is defined as:

[A]ny practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

RCW 62A.1–205(2). It is

helpful in arriving at the commercial meaning of terms used in agreements. It is in fact not even necessary that both parties to the contract have knowledge of the usage of trade. . . .

. . . .

. . . [U]sage of trade may also be used to interpret the terms of a contract which is not on its face ambiguous.

*Commercial Law Deskbook,* at § 5.4(3).

■ Here, the evidence disclosed that both parties were aware of the usage of trade of the term "acres" in a contract for peas. After hearing all extrinsic evidence, the trial court determined that contrary to the "merger clause," the Morgan–Stokely written contract was not a final expression of the parties' agreement. Thus, the court used parol evidence to replace or supplement the terms of the written contract.

The court heard evidence on the trade usage of the term "acres" and determined that the acreage contracted for in the Morgan–Stokely contract was "an indefinite figure to be corrected by the circumstances as to whether [Morgan] could obtain fields which would grow the early peas per [Stokely's] schedule". The court had before it the extrinsic evidence on the conversations that Stokely representatives had with Morgan in regards to the Wallace field. This substantial evidence supports the court's findings, and appellate review is limited to ascertaining whether the findings support the conclusions of law. *Enterprise Timber, Inc. v. Washington Title Ins. Co.*, 76 Wn.2d 479, 482, 457 P.2d 600 (1969). A review of the record indicates that the findings support the conclusions of law.

The judgment is affirmed.

WILLIAMS and CORBETT, JJ., concur.