**SEATTLE TOTEMS HOCKEY CLUB, INC., Eldred W. Barnes, and Vincent H.D. Abbey, Plaintiffs-Appellants,**

v.

**The NATIONAL HOCKEY LEAGUE, the Vancouver Hockey Club, Ltd., Northwest Sports Enterprises, Ltd., et al., Defendants-Appellees.**

**NORTHWEST SPORTS ENTERPRISES, LTD., Counterclaimant-Appellee,**

v.

**Vincent H.D. ABBEY, and Eldred W. Barnes, Counterdefendants-Appellants.**

**Nos. 84–3581, 84–3605.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1986.

Decided Feb. 28, 1986.

Thomas J. Greenan, Ferguson & Burdell, Richard F. Krutch, Krutch, Lindell, Donnelly & Judkins, Seattle, Wash., for Seattle Totems Hockey Club, et. al.

Fredric C. Tausend, Schweppe, Doolittle, Krug, Tausend & Beezer, Seattle, Wash., Herbert Dym, Covington & Burling, Washington, D.C., for Nat. Hockey League, et al.

Before WRIGHT, CANBY and WIGGINS, Circuit Judges.

CANBY, Circuit Judge:

This case arises out of the financial demise of plaintiff Seattle Totems, a hockey team of which plaintiffs Vincent H.D. Abbey and Eldred W. Barnes were principal officers, directors and shareholders. The Totems and Abbey and Barnes brought an antitrust action against the defendant National Hockey League (NHL) and some of its members. One member of that league is the Vancouver Canucks, owned by defendant Northwest Sports Enterprises, Inc. Northwest Sports counterclaimed, asserting certain breaches of contract by plaintiffs.

The district court dismissed plaintiffs' antitrust claims and directed a verdict granting part of defendants' counterclaim and denying the rest. We review both the dismissals and the directed verdict de novo, viewing the evidence in the light most favorable to the losing party. *Los Angeles Memorial Coliseum Com'n v. National Football League*, 726 F.2d 1381, 1387 (9th Cir.), *cert. denied*, —— U.S.——, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984) (directed verdict). Because the antitrust and contract issues were tried separately, we review them separately here.

## PART I. ANTITRUST

The Seattle Totems were a minor league hockey team that played in the Western Hockey League (WHL). They suffered financial difficulties, and in 1971, the WHL terminated their franchise. In 1972, Northwest Sports purchased 55.56% of the Totems' stock. Northwest Sports also agreed to assume the Totems' liabilities and to advance funds for their operations. Abbey and Barnes, who owned a 44.44% interest in the Totems, continued as shareholders and agreed to guarantee repayment of their pro rata share of Northwest Sports' advances to the Totems. The Totems regained their WHL franchise.

In 1971, the World Hockey Association (WHA), which is not a party to this action, was formed as a major professional hockey league. The WHA competed with the established major league, defendant NHL, for players, fans, and revenues.

With the emergence of a second major league, WHL owners concluded that WHL teams needed major league status to survive. In June 1972, the NHL and the WHL entered into an agreement called the "White Paper." The White Paper provided that, if the NHL expanded after the 1974–75 season, it would offer to WHL members at least one-half of any expansion franchises in four WHL cities. In June 1974, the NHL voted to award a conditional franchise to Abbey for Seattle to commence play in the 1976–77 season. The conditional franchise for Seattle expired because Abbey did not fulfill the conditions. The NHL did not award a conditional or final franchise for Seattle to anyone else. The Totems did not seek or receive a WHA franchise.

On appeal, the Totems[1] challenge the district court's dismissal of their antitrust claims that the alleged NHL monopoly wrongfully denied Totems an NHL franchise, denied them the opportunity to join the WHA, and destroyed the WHL. We affirm.

---

**1.** For purposes of the antitrust portion of this opinion, "the Totems" refers collectively to Abbey, Barnes, and the Seattle Totems Hockey Club, Inc.

## I. The Seattle NHL Franchise

The district court dismissed the Totems' claim for damages for their failure to receive an NHL franchise. The district court found that "any denial of an NHL franchise to plaintiffs ... was procompetitive, rather than anti-competitive in its effect and hence not violative of the anti-trust laws."

The Totems argue that they were injured by an NHL monopoly that allegedly violated the antitrust laws. They contend that the NHL and its member teams have monopolized professional hockey in North America. The Totems cite a number of agreements and practices through which the NHL achieved the alleged monopoly. The Totems claim that the NHL monopoly was "exercised to exclude competition and to obtain total control over all major league professional hockey franchises, including the purchase prices paid therefor [sic]."

 The offense of monopolization (15 U.S.C. § 2) consists of the willful acquisition or maintenance of monopoly power in the relevant market and the existence of actual injury to competition in that market. *See General Business Systems v. North American Philips Corp.,* 699 F.2d 965, 970–71 (9th Cir.1983) and cases cited therein. "To establish anticompetitive market effect, the plaintiff must prove that the defendant's actions caused a decrease in competition in the relevant market."[2] *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (9th Cir.1983). A plaintiff has the burden to plead and prove that the defendant's actions harmed competition, not that the actions harmed plaintiff in its capacity as a competitor. *Id.* at 902 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed. 701 (1977); *Gough v. Rossmoor Corp.,* 585 F.2d 381, 386 (9th Cir.1978), *cert. denied,*

440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979)).

 The Totems were not competing with the NHL; they were seeking to join it. They were granted a conditional NHL franchise but failed to fulfill the conditions precedent to obtaining a final franchise. The WHA was competing as a major professional hockey league at that time. Without an NHL franchise Seattle constituted a potential WHA site, and the denial, if any, of an NHL franchise under these circumstances did not injure competition. *See Mid-South Grizzlies v. National Football League,* 720 F.2d 772 (3d Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984). There is no contention or showing that the denial was to protect any other major league team in the Seattle market; there was none. *See id.* at 787; *Los Angeles Memorial Coliseum Com'n,* 726 F.2d 1381 (antitrust violation to restrict entry of one NFL team into another team's market).

The Totems argue that there is more here than the mere denial of a sports franchise. They argue that there was a grand scheme on the part of the NHL to destroy the WHA by promising franchises to WHL teams so that those teams would not join the WHA. "Once peace had been made between the NHL and WHA, however, the NHL moved to avoid its responsibilities" under its White Paper agreement with the WHL. One of those alleged "moves" was apparently to deny Seattle a franchise. This argument misses the point. The Totems' allegations of wrongful conduct by the NHL do not establish that competition in the relevant market was injured by those acts. Consequently, the Totems have failed to meet their burden of proof on this issue.[3]

---

2. "[D]esignation of the relevant market requires considerable judgment. Its dimensions include the product involved, the geographical limits within which it functions, and the appropriate time frame." *General Business Systems,* 699 F.2d at 973. For a discussion of the relevant market for a professional sports association such as the NHL, see *Los Angeles Memorial Coliseum Com'n,* 726 F.2d at 1392–94.

3. Because we determine that the district court properly dismissed the Totems' claims regarding an NHL franchise, we do not reach the Totems' claim that the trial court erred in ruling that their damages arising from the denial of an NHL franchise were measured as of the time of the alleged denial.

## II. Claim of Unlawful NHL Conduct toward the WHA

The district court dismissed the Totems' claim that they were denied an opportunity to join the WHA "for lack of evidence in the record as to the value of a Seattle franchise in that league." [4] "An antitrust plaintiff who is excluded from the relevant market by anticompetitive activity is entitled to recover his lost profits." *Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985). Alternatively, a plaintiff who is excluded from the relevant market may seek to recover the value of his business. *Id.* at 1511 n. 4. A defendant, whose illegal conduct excluded others from the relevant market, should not benefit because its actions make it more difficult for the plaintiff to establish the amount of its injury. *Id.* at 1512. There must, however, be sufficient evidence from which a jury could determine the amount of damages, and the plaintiff bears the burden of anticipating a hypothetical free market in establishing the amount of his injury. *Id.* The trier of fact is allowed to act on probative and inferential proof in determining those damages, although the award may be an approximation. *Id.* at 1511.

The Totems allege that the NHL's anticompetitive activities caused the Totems to be unable to secure a WHA franchise. The district court found that the measure of the Totems' damages on this claim was the value of a WHA franchise in Seattle at the time it was foreclosed from joining the WHA, not the value of an NHL franchise at that time. The Totems, therefore, had the burden of establishing the value of a Seattle WHA team in a hypothetical economic free market. *See id.* at 1512. The Totems presented no evidence to establish that value. Consequently, there was not sufficient evidence from which a jury could have determined damages, and the trial judge properly dismissed this claim.

## II. Destruction of WHL

The district court dismissed the Totems' claim that they were denied the opportunity to form a new major hockey league with other WHL teams. The court found a lack of evidence in the record to sustain that claim. Specifically, the court ruled that "[t]o recover on this claim plaintiffs must prove the intention and preparedness of the WHL clubs to form such a league." The court held that there was no evidence in the record to sustain an affirmative finding upon either element, and that "[t]here is in fact much evidence to the contrary." In addition, the Totems presented no evidence of the value of a Seattle franchise in such a league.

The WHL teams opted not to join the WHA or to form an independent major hockey league. Instead, they entered into the White Paper agreement with the NHL for purposes of obtaining NHL franchises. The record, therefore, supports the district judge's ruling.

The district judge ruled, in a separate order, on the Totems' claim that the NHL's allegedly monopolistic activities caused the destruction of the WHL. The judge found that the assertion of this claim was untimely and that it would be prejudicial to defendants to allow it to be asserted. In addition, the district judge found that the claim was not supported by testimony.

We have reviewed the record and conclude that the district judge did not abuse his discretion by this separate ruling. In addition, the lack of evidence as to the value of a Seattle WHL franchise (whether minor or major league) independent of the NHL in a hypothetical economic free market deprived the jury of sufficient informa-

---

**4.** The trial court found that the Totems had standing to allege an antitrust injury arising from allegedly anticompetitive conduct of the

NHL directed toward the WHA. Because we affirm the district court's dismissal on evidentia-

tion from which to determine damages for such a claim.[5]

## PART II. Northwest Sports' Counterclaim

In 1972, Northwest Sports acquired a 55.56% interest in the Totems. Abbey and Barnes owned a 44.44% interest in the Totems. Abbey, Barnes and Northwest Sports entered into an agreement, dated April 7, 1972 (the 1972 Agreement). This contract provided that Northwest Sports would advance funds to enable the Totems to operate, that Abbey and Barnes would guarantee to Northwest Sports repayment of 44.44% of all moneys advanced by Northwest Sports to the Totems, and that if a National Hockey League (NHL) franchise were granted to the Totems for Seattle, Abbey and Barnes would purchase Northwest Sports' 55.56% interest in the Totems. Abbey and Barnes subsequently agreed to pay to Northwest Sports interest on the repayable 44.44% share of the advances.

On June 12, 1974, the NHL announced the award of a "conditional" franchise to Abbey, as representative of Seattle, to commence play in the 1976–77 season. The award of the franchise was subject to several conditions, including the requirements that a long-term arena lease be obtained and that certain franchise payments be made.

Prior to the NHL's announcement of the award of a conditional franchise to Seattle, Abbey, Barnes and Northwest Sports negotiated the 1974 Agreement.[6] The 1974 Agreement set out the terms for the repurchase of Northwest Sports' shares in the Totems by Abbey and Barnes and provided that Abbey and Barnes would repay the advances made by Northwest Sports to the Totems. A condition precedent to the 1974 Agreement was that the NHL announce, before June 30, 1974, the award of a franchise to Seattle.

Northwest Sports counterclaimed against Abbey and Barnes for breach of the 1972 and the 1974 agreements. The district court rejected a defense theory raised by Abbey and Barnes that Northwest Sports had made it impossible for them to perform the agreements. The district court found that Abbey and Barnes had breached the 1972 Agreement. The court accordingly directed a partial verdict in favor of Northwest Sports. The district court ruled that Northwest Sports was not entitled to reimbursement for player development costs under the 1972 Agreement. With regard to the 1974 Agreement, the district court entered a directed verdict in favor of Abbey and Barnes finding that a condition precedent to that agreement had not been fulfilled. Abbey and Barnes appeal, and Northwest Sports cross-appeals. We affirm the rejection of the contractual interference defense appealed by Abbey and Barnes, and reverse and remand with regard to both issues raised by Northwest Sports on its cross-appeal.

## I. "Impossible Performance" Defense

In granting a partial directed verdict for Northwest Sports on its claims under the 1972 Agreement, the district court rejected the contention of Abbey and Barnes that the jury should decide whether they were relieved of their repayment obligation because Northwest Sports had rendered their performance impossible by its failure to provide an accounting and by its refusal to provide to Abbey the original Seattle Totems' stock certificates.

 One party to a contract who prevents another party from performing his promise cannot recover for the nonperformance of that promise. *Hydraulic Supply Mfg. Co. v. Mardesich*, 57 Wash.2d 104, 352 P.2d 1023, 1024 (1960) (vessel left harbor before refrigerator plant had been reassembled, thereby preventing company

---

ry grounds, we do not address the NHL's contention that the Totems lacked standing.

**5.** Prior to the bail-out by Northwest Sports, which was affiliated with the NHL, the Totems had lost their WHL franchise due to insolvency.

**6.** The 1974 Agreement was not signed by Abbey until July 1974.

from completing testing of its work; shipowners could not recover from company for damages allegedly resulting from improper repair). The purpose of this rule is to prevent a party from benefiting by its wrongful acts. *Wolk v. Bonthius*, 13 Wash.2d 217, 124 P.2d 553, 554 (1942).

Abbey and Barnes rely on *United States ex rel Acme Granite & Tile Co. v. F.D. Rich Co.*, 437 F.2d 549, 553 (9th Cir.1970), *cert. denied*, 404 U.S. 823, 92 S.Ct. 48, 30 L.Ed.2d 51 (1971). That case involved an action by a subcontractor (Acme) for damages against the prime contractor (F.D. Rich Co.) on an army housing project. Acme had refused to proceed with plastering on the project after the Army inspector revoked his approval of some of the houses because of defective framing by another subcontractor. Corrective measures were taken by the framing contractor, but their quality was in dispute. An impasse developed, and Rich declared Acme in default and employed another contractor to finish the work. 437 F.2d at 551. The court concluded that the district court's entry of a judgment notwithstanding the verdict was improper because "there was a question of fact whether Rich, by its failure to have B & G correct the defective framing job, prevented Acme from going ahead with its obligations under the contract." 437 F.2d at 553.

The situation here is not parallel to that in *Acme Granite*. The 1972 Agreement does not provide that Northwest Sports is required to give an accounting to Abbey

and Barnes before the repayment obligation of Abbey and Barnes arises.[7] That obligation arose with each advance made by Northwest Sports to the Totems. Abbey and Barnes do not contend that Northwest Sports failed to make the contracted-for advances to the Totems. While Abbey and Barnes may have hoped to receive an NHL franchise, the fact that they did not, whether or not that failure was due to any wrongful act of Northwest Sports, does not excuse them of their obligation under the 1972 Agreement to repay Northwest Sports 44.44% of moneys advanced or paid on behalf of the Totems. That obligation was not conditioned upon obtaining an NHL franchise.

■ Northwest Sports, therefore, did not interfere with the ability of Abbey and Barnes to perform, nor did Northwest Sports make performance physically impossible. *See Acme Granite*, 437 F.2d at 553; *Hydraulic Supply Mfg. Co.*, 352 P.2d at 1024. The district court did not err in rejecting the impossible performance defense and directing a verdict in favor of Northwest Sports on Abbey and Barnes' breach of their repayment obligation under the 1972 contract. We affirm.

## II. "All Moneys Advanced"

■ The 1972 Agreement provides that Abbey and Barnes agreed to pay Northwest Sports 44.44% of "all moneys advanced by Northwest to Totems or paid by

---

7. The 1972 Agreement provides:

Abbey and Barnes covenant and agree with Northwest that they will pay or cause to be paid to Northwest 44.44% of all moneys advanced by Northwest to Totems or paid by Northwest on behalf of Totems (whether advanced or paid prior or subsequent to the date hereof) whenever the same or any portion thereof become due and payable and that Abbey and Barnes will at all times indemnify, protect and save harmless Northwest from all costs, losses, expenses and damages arising by reason of any default of Totems to repay any of such moneys, and that no release or releases by Northwest of the whole or any part of the obligations of Totems no matter in what manner any such release or releases may come about, and no indulgence shown by

Northwest in respect of any defaults of Totems in repaying such moneys and no extension or extensions granted by Northwest to Totems for the repayment of any such moneys, nor any other dealings between Northwest and Totems shall in any way modify, alter or prejudice Northwest or the liability of Abbey and Barnes in any way hereunder. Northwest shall not be obliged to exhaust its recourses against Totems before requiring payment or performance by Abbey and Barnes. Any accounts settled or stated by or between Northwest and Totems or admitted by or on behalf of Totems may be adduced by Northwest and shall in that case be accepted by Abbey and Barnes as conclusive evidence that the balance or amount thereby appearing is due by Totems to Northwest.

Northwest on behalf of Totems . . . ." The trial judge ruled, as a matter of law, that Northwest Sports was entitled to recover from Abbey and Barnes 44.44% of the advances made by Northwest to the Totems, "other than those advances which were made for player development." The judge reasoned that advances for player development were made primarily for the benefit of Northwest Sports' Vancouver hockey club not for the Totems. The judge based his conclusion in part on the fact that, for Canadian tax purposes, the Vancouver club and Northwest Sports treated.player development costs as expenses incurred by the Vancouver club and Northwest Sports, not as costs of the Totems for which Northwest Sports was making advances.

Northwest Sports argues that the contractual term "all moneys advanced" is not ambiguous and that the trial court erred in admitting extrinsic evidence of Northwest Sports' tax treatment of the advances. Abbey and Barnes point to the compound nature of the provision which could be rewritten as "all moneys advanced by Northwest to Totems" and "all moneys paid by Northwest on behalf of Totems." Abbey and Barnes contend that the term "advanced" referred to sums expended by Northwest Sports to enable the Totems to pay several of its outstanding debts and liabilities that existed prior to or at the time Northwest Sports acquired its shares of the Totems stock, whether Northwest made the advances before or after the date of the 1972 Agreement. On the other hand, "all moneys paid on behalf of Totems" must, Abbey and Barnes argue, be read to exclude sums paid for player development costs because those sums were "paid to the Totems for the purpose of training players for the NHL, and thus Vancouver's benefit."

" 'The intent of the parties to the contract is to be gleaned from the document itself, and only if it is ambiguous is parol evidence regarding the parties' actual intent admissible.' " *Kwik-Lok Corp. v. Pulse*, 41 Wash.App. 142, 702 P.2d 1226,

1229 (1985) (quoting *McGary v. Westlake Investors*, 99 Wash.2d 280, 285–86, 661 P.2d 971 (1983)) (citation omitted). The term "ambiguous" means " 'capable of being understood in either of two or more possible senses.' " *Kwik-Lok Corp.*, 702 P.2d at 1229 (quoting *McGary v. Westlake Investors*, 99 Wash.2d 280, 285–86, 661 P.2d 971 (1983)). "Words in a contract are to be given their ordinary meaning unless the context dictates otherwise." *General Tel. Co. of the Northwest v. C–3 Assoc.*, 32 Wash.App. 550, 648 P.2d 491, 493 (1982). Whether a written contract is ambiguous is a question of law reviewed de novo. *See General Tel. Co.*, 648 P.2d at 493.

The issue here is whether player development costs paid by Northwest Sports fall within the scope of the reimbursement provision. In order to determine whether those payments were made "on behalf of" the Totems, the court properly admitted extrinsic evidence to determine the purpose of those payments, but not to expand, vary or contradict the terms of the contract. *See Morgan v. Stokely-Van Camp, Inc.*, 34 Wash.App. 801, 663 P.2d 1384, 1388 (1983). Northwest Sports contends that the trial court incorrectly evaluated that evidence in determining that amounts paid by Northwest Sports for player development costs did not constitute recoverable advances. We agree.

The trial court characterized all sums paid by Northwest Sports after the commencement of the 1972–73 season as player development costs. Prior to that point, Northwest Sports had advanced $595,000.[8] During and after the 1972–73 season Northwest Sports advanced over a million dollars to the Seattle Totems. The Totems then billed Northwest Sports for that amount as "cost of developing players" for the Vancouver Hockey Club, Ltd. These costs included salary, FICA, workman's compensation and bonuses.

Northwest Sports acknowledges that it intended to use the Totems as Vancouver's development club to train young hockey

---

8. The district judge awarded Northwest Sports $264,418, which is 44.44% of $595,000, less pay-

ments received plus interest on the unpaid balance.

players before they entered major league competition, replacing its development club in Rochester, New York. Northwest Sports' tax treatment of the advances as player development costs is also probative on the issue of whether these payments were on behalf of the Totems. Nevertheless, the "paid on behalf of Totems" provision would be rendered meaningless if we construe it to exclude all advances by Northwest Sports to the Totems for operating expenses incurred by the Totems after Northwest Sports' acquisition of its majority interest.

The payments by Northwest Sports benefited the Totems directly, because they enabled the club to operate. Vancouver benefited also, because it was able to use the Seattle club to develop future major league players. We, therefore, conclude that the parties intended that Northwest Sports be reimbursed by Abbey and Barnes for all sums paid to the Totems to enable the club to continue in existence whether or not those sums also constituted payments for player development expenses of Northwest Sports. We reverse the partial directed verdict entered in favor of Abbey and Barnes and remand to the district court for entry of judgment in accordance with this opinion on Northwest Sports' breach of contract claim arising out of the 1972 Agreement.

### III. Condition Precedent—1974 Agreement

█ Northwest Sports contends that the district court erred in ruling, as a matter of law, that the condition precedent in the 1974 Agreement had not been met and by directing judgment for Abbey and Barnes on Northwest Sports' breach of contract claim arising out of the 1974 Agreement. The 1974 Agreement provided: .

This Agreement (with the exception of this paragraph) shall only be effective if, prior to June 30, 1974, the National Hockey League announces that it shall grant a National Hockey League Franchise to Totems or to N.H.L.-Seattle and shall be effective as of the date of such announcement.

On June 12, 1974, the NHL announced that it would grant a franchise to the Abbey group, subject to the fulfillment of several conditions. The district court found that the announcement of the grant of a conditional franchise to the Abbey group on behalf of Seattle did not satisfy the condition precedent because "the 1974 agreement was conditioned upon the announcement of the granting of an *actual* NHL franchise, which never occurred." (Emphasis added.)

The ambiguity in the 1974 contract [9] arises from the parties' failure to specify whether they meant the announcement of a conditional franchise *or* the announcement of an actual or final franchise *or* the announcement of any kind of franchise, conditional or final. The record shows that Northwest Sports owned one NHL team and that the 1972 Agreement provided for the buyback of Totems' stock for Northwest Sports if the Totems were awarded an NHL franchise. The 1974 Agreement, which provided the terms of the buyback, conditioned its effectiveness on the announcement of "a" franchise before a specified date.

It is significant that the 1974 Agreement required only an announcement, not the actual award of a franchise. In addition, it was apparently not unusual for the NHL to condition franchise awards upon the receipt of franchise payments and assurance of a facility. The parties may not have even contemplated that, once the long-awaited Seattle NHL franchise was granted, Abbey

---

**9.** Paragraph 18 of the 1974 Agreement provides that "[t]his Agreement shall be interpreted in accordance with the laws of the Province of British Columbia." The parties have not raised the issue of the applicable law and no British Columbia law has been cited. Rule 44.1, Federal Rules of Civil Procedure, requires a party who intends to raise the law of a foreign coun-

try to give notice in his pleadings or other reasonable written notice. Where the parties do not give notice of intent to raise issues of foreign law, this court is under no obligation to apply foreign law to construe a contract. *See Commercial Ins. Co. of Newark, N.J. v. Pacific-Peru Const. Corp.,* 558 F.2d 948, 952 (9th Cir. 1977).

and Barnes would be unable to obtain the necessary financial backing and that a conditional franchise would not mature to an actual franchise.

We conclude that the parties intended the 1974 Agreement to be effective upon the announcement that Seattle would get a franchise, even if that announcement was conditioned on the securing of a facility and the making of franchise payments. Had Abbey and Barnes complied with those conditions, and the 1974 agreement, they would have been full owners of the Totems at the time a franchise was entered into. The district court erred by interpreting the condition precedent in the 1974 Agreement to require the announcement by the NHL of the grant of an "actual" franchise to Seattle. We reverse the district court's dismissal of Northwest Sports' counterclaim for breach of the 1974 Agreement and remand.

AFFIRMED AS TO APPEAL; REVERSED AND REMANDED AS TO CROSS APPEAL.