**MURPHY TUGBOAT COMPANY, Plaintiff-Appellant,**

v.

**Thomas B. CROWLEY; Shipowners & Merchants Towboat Company, Ltd,; Bay Cities Transportation Company; Harbor Tug & Barge Company; Tug Sea Cloud, Inc.; Tug Sea Fox, Inc.; Tug Sea Horse, Inc.; Tug Sea King, Inc.; Tug Sea Lark, Inc.; Tug Sea Lion, Inc.; Tug Sea Prince, Inc.; Tug Sea Robin, Inc.; Tug Sea Rover, Inc.; Tug Valiant, Inc.; Tug Trojan, Inc.; Tug Atlas, Inc.; Tug Sea Wolf, Inc.; Crowley Launch & Tugboat Company; Cary-Davis Tug & Barge Company and Long Beach Tugboat Company, Inc., Defendants-Appellees.**

No. 79–4266.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 12, 1981.

Decided May 11, 1981.

As Amended on Denial of Rehearing and Rehearing En Banc Oct. 15, 1981.

Ronald Lovitt, Lovitt & Hannan, Inc., San Francisco, Cal., argued, for plaintiff-appellant; Robert L. Palmer, Martori, Meyer, Henricks & Victor, Phoenix, Ariz., Henry I. Bornstein, San Francisco, Cal., on brief.

Kristina M. Hansen, San Francisco, Cal., argued, for defendants-appellees; Richard J. Archer, Sullivan, Jones & Archer, San Francisco, Cal., on brief.

Before WALLACE and POOLE, Circuit Judges, and SMITH,* District Judge.

WALLACE, Circuit Judge:

In this treble damages antitrust action pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, Murphy Tugboat Company appeals from a judgment n. o. v, in favor of defendant competitor tugboat companies. We affirm.

I

Defendants Shipowners & Merchants Towboat Company (Red Stack) and Bay Cities Transportation Company (Bay Cities) have been long established in the ship assisting and ship towing business in San

---

* Honorable Russell E. Smith, United States District Judge, District of Montana, sitting by designation.

Francisco Bay and its tributaries. Defendant Crowley Maritime Corporation is a holding company for the two tugboat companies. Defendant Thomas B. Crowley was the principal officer of and had substantial ownership interest in each of these companies. Plaintiff Murphy Tugboat Company (Murphy) entered the ship assisting business in the fall of 1971. It remained in business until September 1975.

Ship assisting is the providing of tugs to aid vessels in docking or undocking. Although some ships under some circumstances can dock or undock without the use of tugs, they frequently require the assistance of one or more tugs. Tugs also perform "flat tows," moving vessels that are not under power.

From 1971 to 1975 Red Stack and Bay Cities performed at least 70% of the tug assisted docking and undocking in San Francisco Bay (excluding military and other proprietary operations). Bay Cities, operating small tugs, served primarily small vessels—vessels of less than 14,000 net tons. It charged a flat rate per tug. Red Stack, operating larger tugs, usually served larger vessels. It used a grid tariff that took into account the size of the vessel and the length of the ship assist move. This grid tariff generally produced higher charges.

For some years prior to Murphy's entry into the market, Red Stack and Bay Cities had a policy of refusing, except in emergencies, to provide service to a vessel that was being assisted by tugs of another company. Red Stack and Bay Cities justified this policy in terms of the hazards of divided responsibility in ship handling. However, other companies under common control with Red Stack and Bay Cities, but operating in different harbors, did not have such a policy. There was evidence before the jury that large vessel and flat tow customers were deterred from hiring a Murphy tug by the knowledge that if the need for additional tugs arose during the operation, they would not be available.

Most docking and undocking requires the services of an inland pilot. The masters of Red Stack tugs were licensed inland pilots.

When Red Stack tugs assisted a vessel, the master of one of the tugs would, at the vessel's request, serve as pilot. Red Stack made no extra charge for this service, but the Red Stack employee pilot collected a fee from the vessel. That fee was set by agreement between Red Stack and the Red Stack Pilots' Association (RSPA).

The jury awarded damages of $700,000 against several defendants for violation of section 2 of the Sherman Act, 15 U.S.C. § 2, predicated on the boycott of ships making use of the tugs of other companies. The jury also awarded $100,000 against Red Stack for violation of section 1 of the Sherman Act, 15 U.S.C. § 1, by virtue of the RSPA agreement. The district judge granted judgment n. o. v. on the section 1 claim on the basis that the RSPA agreement was immune under the labor exemption of the Clayton Act, 15 U.S.C. § 17, and under the theory that a corporation and its employees cannot conspire to restrain competition within the meaning of section 1 of the Sherman Act. In addition, the district judge found that the jury damages award under section 1 was unsupported by the evidence. Judgment n. o. v. was granted on the section 2 claim, involving the boycott of ships assisted by other companies' tugs, because the district judge found that there was insufficient evidence supporting Murphy's damages theory on this claim. *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F.Supp. 841 (N.D. Cal. 1979).

II

In asserting its section 1 claim, Murphy relies on the fact that when a Red Stack pilot was used, the fees, as fixed by the RSPA agreement, were lower than the fees otherwise charged by pilots in the San Francisco Bay area. Murphy argues that this agreement was anticompetitive and that Murphy was injured thereby because the Red Stack package price, including tugs and pilot fee, was lower as a result of the agreement than it otherwise would have been. If the Red Stack package price had been higher, Murphy contends that it would

have been able either to have charged a higher price itself, while maintaining its market share, or to have maintained its price thereby obtaining a larger market share.

■ We conclude that if Murphy was injured by the RSPA agreement it was not "by reason of anything forbidden in the antitrust laws ...." 15 U.S.C. § 15.[1] By keeping pilots on its payroll as part of its five man tugboat crews, Red Stack was indirectly able to make available to its customers pilot services at discount rates. Thus, the RSPA agreement amounts to an indirect subsidy given by Red Stack to its customers, at a cost to Red Stack of the wages of its pilot-employees.

Because Murphy did not itself provide pilot services, it is not in a position to, and does not, complain that it was injured by the RSPA fee, except as that fee was perceived by customers as a component of Red Stack's package price. *See California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727, 732 (9th Cir. 1979). Thus the test for whether the RSPA agreement constitutes an unreasonable restraint of trade of which Murphy can complain is the same test as that for whether Red Stack's overall pricing policies constitute anticompetitive conduct.

Because "[t]he antitrust laws ... were enacted for 'the protection of *competition, not competitors*,'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), *quoting Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8

L.Ed.2d 510 (1962), those laws do not prohibit non-predatory conduct that results in a lower price to the consumer. The antitrust laws do not require the erection of a price umbrella for the benefit of inefficient competitors. Thus, whether Murphy can complain of the RSPA agreement as a violation of section 1 of the Sherman Act depends on whether the agreement was in furtherance of a scheme of predatory pricing.

Murphy concedes that Red Stack's prices were always significantly higher than Murphy's own—in some cases over twice as high. Murphy does not allege that Red Stack's marginal costs,[2] which would include the labor based cost of providing the indirect subsidy through the RSPA agreement, ever exceeded Red Stack's price. Red Stack's pricing, therefore, was not predatory for the reasons stated by the district court in *Murphy Tugboat Co. v. Crowley*, 454 F.Supp. 847, 853–57 (N.D. Cal. 1978). *Pierce Packing Co. v. John Morrell & Co.*, 633 F.2d 1362, 1365–66 (9th Cir. 1980); *see California Computer Products v. International Business Machines Corp., supra*, 613 F.2d at 742–43; *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 857–58 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Hanson v. Shell Oil Co.*, 541 F.2d 1352, 1358–59 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977). As Red Stack's overall pricing conduct was legal, the RSPA agreement in furtherance of that conduct was also legal.

---

**1.** Section 4 of the Clayton Act, 15 U.S.C. § 15, provides in part that
[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained ....

**2.** Marginal cost is defined as "the increment to total cost that results from producing an additional increment of output." Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv.L.Rev. 697, 700 (1975). "As a matter of short-run economic welfare, it is beneficial to increase

production and lower prices so long as price exceeds marginal cost. ... In the long run there are complications. ... However, long-run economic welfare consequences are 'intrinsically speculative and indeterminate' and, in considering the limitations of the judicial process, are properly disregarded in formulating a test for predatory pricing. Areeda & Turner, *Scherer on Predatory Pricing: A Reply*, 89 Harv.L.Rev. 891, 896–97 (1976)." *Janich Brothers, Inc. v. American Distilling Co.*, 570 F.2d 848, 857 n.9 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).

Because we conclude as a matter of law that the RSPA agreement is not a contract or conspiracy in restraint of trade within the meaning of section 1 of the Sherman Act of which Murphy can complain, we need not consider whether that agreement would fall under either the labor exemption to the antitrust laws, 15 U.S.C. § 17, or the principle that agreements between a corporation and its employees do not constitute a conspiracy under section 1, *see Chapman v. Rudd Paint & Varnish Co.*, 409 F.2d 635, 643 n.9 (9th Cir. 1969).

### III

Even though the district judge concluded that the jury could properly find the boycott illegal and that it had an adverse impact on Murphy, he held that Murphy's proof of damages was insufficient in its Sherman Act section 2 claim. Although Murphy was not entirely consistent on the legal theory underlying its damages computation pursuant to section 2, the final theory contains two damage components. The first is lost profits attributable to Red Stack's boycott of jobs on which a Murphy tug was used, up to the time that Murphy ceased operation. The second component was lost future profits for the five years following its demise.

 We may affirm the district judge's granting of judgment n. o. v. on these damages issues only if the district judge's conclusion is the only reasonable one "[viewing] the evidence in the light most favorable to the party in whose favor the jury verdict was rendered and [giving] that party the benefit of all inferences that might fairly have been drawn by the jury." *Fount-Wip, Inc. v. Reddi-Wip, Inc.*, 568 F.2d 1296, 1300 (9th Cir. 1978). Moreover, in a case in which the defendant has prevented the plaintiff's entry into a market, we must adopt a special solicitude towards the proof of damages.

[E]ven where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork.

But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act upon probable and inferential, as well as direct and positive proof." *Story Parchment Co. v. Patterson Co.*, [282 U.S. 555], 561–4, [51 S.Ct. 248, 250–51, 75 L.Ed. 544]; *Eastman Kodak Co. v. Southern Photo Co.*, [273 U.S. 359], 377–9, [47 S.Ct. 400, 404–405, 71 L.Ed. 684]. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

### A. *Past Profits.*

Murphy attempted to establish that prior to its going out of business it lost profits due to the Red Stack boycott. The district judge ruled its evidence was insufficient. Murphy's theory was that the boycott effectively prevented it from entering the more profitable segment of the ship assist market—that segment embracing ships of over 14,000 tons and flat tows. The amount of these lost profits was not directly established. An expert economist did testify that, under his assumptions and absent the boycott, Murphy would have made a sufficient profit in the large vessel and flat tow market segment to bring Murphy's total shipwork business out of the red and into the black. Because no evidence was admitted of the dollar amount by which Murphy would have exceeded the breakeven point, the expert witness's understanding of Murphy's losses constituted the only lost past profits figure before the jury. Thus, Murphy's losses are relevant, not because those losses themselves were directly attributable to the illegal conduct, but because Murphy's expert witness used the loss figure as a bench mark by testifying that lost past profits would at least have equaled that figure. The figure, according to Murphy's citation to the record, came from Roger Murphy's testimony on the basis of his in-

come tax records.[3] We need not, however, start with those tax records and engage in a dollar for dollar examination of the maximum figure supported by the record, because we conclude that the damages theory has fundamental problems that make it unacceptable as a whole, whatever the appropriate bench mark figure were to turn out to be.

The heart of Murphy's lost past profits damages theory is that, absent the boycott, Murphy would have obtained a significant share of the large vessel and flat tow segment of the market. There was evidence that the marginal revenue generated in this segment of the market would have been greater than Murphy's historical marginal operating costs. The theory is that this added profit would have been sufficient to overcome the historical operating losses. The expert witness suggested three different strategies that Murphy might have pursued in the absence of the Red Stack boycott. In each case, the bench mark figure of new profits would have been reached only if Murphy achieved at least a share of approximately 14% of the large vessel and flat tow market segment.

Murphy contends that the 14% market share is conservative in the light of the fact that Murphy's share of the small vessel market segment approximated 28%. Murphy argues that, absent the boycott, it is to be expected that it would enjoy the same share of the large vessel market segment as it enjoyed in the small vessel market segment. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 118–19, 89 S.Ct. 1562, 1573–74, 23 L.Ed.2d 129 (1969). Murphy offered evidence that its capacity was sufficient to absorb this additional market share.

Other aspects of Murphy's theory, however, rely upon differences between the two separate market segments. We must examine these differences to determine whether the evidence presented was sufficient for the jury to make a just and rea-sonable inference that Murphy's market share success in the small vessel market segment could be projected into the large vessel and flat tow market segment. *See Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 911 (2d Cir.), cert. denied, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

The most important difference, and the key to Murphy's relative success in the one market segment and its nearly complete foreclosure from the other, is that large vessel and flat tow shipwork requires, statistically, more tugs per job. In particular, it requires the availability of additional tugs in case difficulty is encountered. Because Red Stack had considerable excess capacity, under Murphy's own capacity calculations, Red Stack would almost always be in a position to provide all the tugs for those customers preferring to use the Red Stack equipment. Murphy would be called upon only where there was a preference to have at least one of Murphy's tugs instead of Red Stack's.

The large vessel and flat tow market segment typically requires multiple tugs per job. Murphy's figures indicate that the average is 2.2 tugs per job. Thus, the per job preference for Murphy would have to be higher than its per tug market share. For example, for the period during which Murphy had only one large tug in operation, if all large vessel jobs had required two tugs, then in order for Murphy to have a 28% per tug market share there would have to be a preference to use a Murphy tug, rather than all Red Stack tugs, for 56% of the jobs. Using Murphy's average figure of 2.2 tugs per job, and assuming preference for Murphy's equipment to be distributed evenly across jobs using different numbers of tugs, there would need to have been a preference of 61.6% in favor of the use of Murphy's large tugboat in order that Murphy should enjoy its 28% market share on a per tug basis. The corresponding figure in order for Murphy to enjoy the 14% market share

---

**3.** Thus, any other evidence of losses, for example an accountant's testimony as to going out of business losses unless represented in the income tax records as testified to by Roger Murphy, is irrelevant to the damages theory as presented by Murphy.

that Murphy's expert testified would wipe out the loss and produce a slight profit, is a 30.8% preference for the use of Murphy equipment on a per job basis. These preference figures would be somewhat lower if the preference for Murphy tugs were expressed disproportionately in the jobs requiring one or two tugs and less in the jobs requiring three or more tugs. Nonetheless, we can properly assume that for Murphy to obtain a given market share in the large vessel and flat tow market segment, it would require a greater preference for Murphy equipment than would the same market share in the small vessel market segment. This reduces the plausibility of a simple projection from the small vessel market to the large vessel market and increases the importance of the other evidence bearing on the question of the market share that Murphy could have been expected to achieve in the large vessel and flat tow market segment absent the boycott. We next consider that evidence.

There was evidence that those responsible for ordering tugboats would have preferred that the Red Stack boycott policy not be in effect, and that the mixing of tugs from different companies be an available option when circumstances warranted it. There was, however, no evidence from which the jury could assess the relative preference of customers for obtaining all the tugboats for a given job from one company when that was easily possible. Because Red Stack could always, or nearly always, provide all the tugboats for any job, some evidence on the strength or weakness of preference for the simplicity of ordering and billing and the unproblematical liability relations of unmixed tug jobs was needed before a jury could reasonably project Murphy's market share in the market segment for which multiple tugs were common. Thus the jury was left without necessary evidence to determine the impact of boycottless choice by customers who may well consider other reasons for wanting to work with a single tug company on a particular job.

The expert witness's testimony as to Murphy's expected share in the large vessel and flat tow market segment depended upon an assumption that Red Stack would not cut its prices in reaction, even to a loss of over one-quarter of its prior share of this portion of the market. Murphy argued that Red Stack had never cut its prices, and that there was no reason to believe that it would have done so under the hypothetical circumstances. A reasonable jury could not, however, indulge in the assumption that a competitor would follow a course of behavior other than that which it believed would maximize its profits. *See Knutson v. Daily Review, Inc.*, 548 F.2d 795, 812 (9th Cir. 1976), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). Just as there was no need for Murphy to prove that it would adopt a variant of the Red Stack grid price system and raise its prices if that would be in Murphy's economic best interest, so Red Stack need not introduce evidence to show that it would have reduced its prices if that would have increased its profitability by preserving a larger market share. In a hypothetical economic construction, such as the one underlying Murphy's theory on lost past profits, economic rationality must be assumed for all competitors, absent the strongest evidence of chronic irrationality. Otherwise it will be impossible to keep speculation in check.

■ Murphy contends that it enjoyed a relative cost advantage over Red Stack. Red Stack's higher labor costs, it argues, would have put a limit on Red Stack's ability to cut prices. It was not demonstrated, however, just where this limit was. The jury was given no reason to believe that Red Stack could not have engaged in some price reductions in the large vessel and flat tow market segment. Indeed, Murphy argued that Red Stack's grid pricing system was so high in this segment of the market that it accounted for the extraordinary profitability of this segment as opposed to the small vessel segment. The charge for a Murphy tug plus a pilot was always less than half and at times as low as 41% of the Red Stack tug and pilot package. In the light of Red Stack's high charges in the large vessel and flat tow market segment, no jury could reasonably find that Red Stack could not significantly have cut its prices, in an attempt to protect its market share. Because this key assumption of

Murphy's economic expert was left without evidential basis, the jury could only have been engaging in unguided speculation when it found that Murphy would have achieved a sufficient market share to ensure a profitability that would have overcome its losses. Thus, there was on this element of damages insufficient "relevant data" for the jury to "make a just and reasonable estimate." Instead the verdict can only have been "based on speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc., supra*, 327 U.S. at 264, 66 S.Ct. 815, 90 L.Ed. 1040.[4]

### B. *Lost Future Profits.*

Murphy's damages theory with respect to lost future profits starts out where its theory on lost past profits concluded. It assumes that, absent the boycott, Murphy would have been profitable because of its increased market share in the large vessel and flat tow market segment. Therefore, instead of going out of business in 1975, Murphy would have continued in business and would have made profits for at least the next five years. These profits were then calculated by projecting Murphy's actual historical revenue and multiplying that by Bay Cities' lowest rate of profit during the years of Murphy's existence. Because the jury could not reasonably have reached the first step of Murphy's argument, that absent the violation Murphy would have been a profitable enterprise, they could not reasonably have inferred that Murphy would remain in operation after 1975. Therefore, there is insufficient support in the record for the awarding of lost future profits. We need not reach the question whether Bay Cities, which did almost no work in the large vessel or flat tow market segment, and did barge towing of a sort that Murphy did not undertake, was a sufficiently similar enterprise to permit the use of its profit percentage in calculating Murphy's lost future profits.[5]

Thus, we conclude that the district judge was not in error when he granted the judgment n.o.v.[6]

AFFIRMED.

---

4. Because of our conclusion that Murphy's past lost profits theory was fatally deficient for the reasons discussed above, we need not consider whether the jury had sufficient evidence from which to conclude that Murphy would have had sufficient capacity to handle the increased market share in the large vessel and flat tow market segment to ensure profitability. The issue is whether additional evidence was needed to project the capacity from the small vessel market segment to the typically multiple tug situation of the large vessel and flat tow market.

5. Because we conclude that no relief may be granted, we need not reach the issues of the liability of Thomas B. Crowley and Crowley Maritime Corporation.

6. Because it was not argued before the district court or timely raised on appeal, we do not decide whether an antitrust plaintiff who has established injury but proved no quantum of damages may be entitled to nominal damages and/or costs.