**HARKINS AMUSEMENT ENTERPRISES, INC., and Daniel E. Harkins, individually and doing business as Tower Plaza Cinemas I and II, Plaintiff,**

v.

**GENERAL CINEMA CORPORATION, et al., Defendants.**

**No. CIV 77–736 PHX CLH.**

United States District Court, D. Arizona.

May 24, 1990.

See also 748 F.Supp. 1395.

Edwin Tobolowsky, N. Henry Simpson, Tobolowsky, Prager & Schlinger, Dallas, Tex., David N. Farren, Joseph Wm. Kruchek, Shimmel, Hill, Bishop & Gruender, P.C., William P. French, Ann A. Scott Timmer, Scult, Lazarus & French, P.A., Phoenix, Ariz., for plaintiff Harkins Amusement Enterprises, Inc.

Robert C. Hackett, David W. Dow, Thomas M. Quigley, Mohr, Hackett, Pederson, Blakley, Randolph & Haga, P.C., Phoenix, Ariz., for defendant American Multi–Cinema, Inc.

Harry B. Swerdlow, Cooper, Epstein & Hurewitz, Beverly Hills, Cal., for defendant The Harry Nace Co.

John P. Frank, Andrew S. Gordon, Janet Napolitano, Lewis & Roca, Phoenix, Ariz., for distributor defendants United Artists Communications Theatres, Paramount, 20th Century Fox, Universal Exchanges, Warner Bros., Columbia Pictures, AVCO, MGM and MPAA.

Joel Linzner, Linda J. Margolies, Khourie, Crew & Jaeger, San Francisco, Cal., for defendant United Artists Communications, Inc.

## MEMORANDUM OPINION AND ORDER

HARDY, District Judge.

A damage study prepared by Professor Michael Conant, Harkins' damage expert, presents three alternative methods for calculating damages based on a market share, yardstick, and a picture-by-picture methods of analysis. Separate motions attacking the admissibility and validity of the damage study have been filed by United Artists Theatre Circuit, Inc. ("UATC"), the distributor defendants, and American Multi–Cinema, Inc. ("AMC"). The motions will be granted in part and denied in part.

### I. *Applicable Standard*

■ It is well settled that "in a case in which the defendant has prevented the plaintiff's entry into a market, we must adopt a special solicitude toward the proof of damages." *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1260 (9th Cir. 1981). However:

> [E]ven where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances, 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.' [citations omitted] Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim.

*Id.* at 1260 (Quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)); *see also Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506, 1509–10 (9th Cir.1985); *Farley Transportation Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1358 (9th Cir.1985).

A recent Supreme Court case explains the rationale behind allowing the plaintiff in an antitrust action great latitude in estimating the amount of damages:

> Our willingness to accept a certain degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the market place usually deny us sure knowledge of what the plaintiff's situation would have been in the absence of the defendant's antitrust violation.

*J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981). The Court held that it would be a "perversion of fundamental principles of justice" to deny recovery of damages because the defendant's unlawful conduct "is of such a nature as to preclude the ascertainment of the amount of damages with certainty." *Id.* at 567, 101 S.Ct. at 1929 (quoting *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927)).

### II. *UATC's Motion in Limine*

While UATC alleges numerous grounds for its motion in limine, the bulk of UATC's motion concentrates on three main arguments.

#### A. Segregating Lawful and Unlawful Conduct

UATC claims that the damage study is not admissible because it does not account for those pictures where a defendant-exhibitor's bid was clearly superior to Harkins' bid, and therefore fails to measure profits lost solely as a result of exclusionary conduct. According to UATC, such pictures were not lost due to the conspiracy to exclude competition from the market, but due to legitimate bidding competition from the defendant.

#### 1. *Loss of Individual Licenses Not Necessarily Relevant to Market Share Method*

■ Dr. Conant bases his market share method of damages on the total superior first-run box office revenues of all theaters in the market which typically played superior, first-run films ("first run theaters") during the relevant damage period. The study divides that figure by the number of screens of all such theaters in order to

calculate the box office admission grosses for the average first-run screens in the Phoenix market.

The relevant four-year period in this case was divided into eleven sub-periods to reflect the increase in the number of theaters in the market over time. The competitive share for each period represents a reasonable estimate of the plaintiffs' expected share of superior first-run box office grosses in a freely competitive market. For each of the eleven periods, the average superior first-run box office gross per screen of each first-run exhibitor is multiplied by the number of available first-run screens operated in that period by Harkins. These are Harkins' expected total superior first-run grosses in a free market.

Once the grosses from the first-run films Harkins was able to license are subtracted, the resultant figure is the net competitive share for each period and represents the loss of superior first-run box office revenues allegedly caused by Harkins exclusion from the market. The net competitive shares for each period are aggregated to obtain the total net admission losses for the entire damage period. Once total expenses such as film rental and other assorted expenses are deducted from the total net competitive gross, the resulting figure is Harkins' adjusted net loss of expected profits from box office admissions during the relevant damage period.

A damage calculation based on a plaintiff's share of the gross that could be expected in a hypothetically free market—which is not based on damages lost from the denial of specific film licenses due to anticompetitive activity—does not necessarily require that those specific films lost to legitimate competition be excluded from the study where the anticompetitive impact of the conspiracy on the market as a whole is clear.

Harkins claims that in the absence of the defendants' conspiracy to restrain competition in the market for the licensing of first-run films, he would have obtained a share of that market consistent with the performance of his competitors and his share of the screens capable of showing first-run films. The fact that individual films may have been lost to "legitimate competition" does not necessarily alter the damages Harkins suffered as a result of the anticompetitive impact of the conspiracy as a whole upon his ability to compete in the market.

Admittedly, if the defendants can convince the jury that Harkins' lack of success in licensing first-run films during the damages period was a result of the overall inferiority of his bids—as opposed to the activities of the defendants taken in furtherance of the conspiracy—then he will have failed to prove that the conspiracy resulted in his exclusion from the market.[1]

However, if Harkins can establish that the conspiracy was a material cause of his inability to compete, he is entitled to some recovery. *Alexander v. National Farmers Organization*, 687 F.2d 1173, 1210 (8th Cir.1982). The extent to which Harkins' inability to license first run films was due to the alleged conspiracy—as opposed to the inferiority of his bids and theaters—is a question for the trier of fact.

Once the fact of injury is established, the trier of fact has broad latitude in assessing the amount of damages to be recovered. *See Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969); *Bigelow v. RKO Pictures Incorporated*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). Consequently, where the defendant's un-

---

1. The Ninth Circuit specifically declined to hold that "Harkins' bids were so poor as to fail to raise a triable issue of fact whether the distributors' consistent pattern of awarding films to designated exhibitors in the midst of an admittedly anticompetitive market was justified. *Harkins Amusement Enterprises v. General Cinema Corp.*, 850 F.2d 477, 485 (9th Cir.1988).

UATC provides two examples, involving the firms *Midway* and *McArthur* where an exhibitor-defendant's bid on a film was "clearly superior" to Harkins' bid on the same film. Harkins disputes the use of *Midway* as an example of a clearly inferior bid on a bid-for-bid comparison. Questions of fact exists as to the superiority of the respective bids and on whether individual bids were "rigged" in those situations where there was an appearance of competitive bidding. Since UATC has only provided the court with two examples, we are not in a position to evaluate similar challenges to other films.

lawful conduct is found to be a material cause of the plaintiff's injury, "[a] Plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury." *Zenith Radio Corp.*, 395 U.S. at 114, n. 9, 89 S.Ct. at 1571, n. 9.

In *Agrashell, Inc. v. Hammons Products Co.*, 479 F.2d 269, 283 (8th Cir.1973), the Eighth Circuit assessed the sufficiency of the damages evidence in a case where the damage claim was based on the assumption that the defendant engaged in four types of unlawful conduct, one of which had been rejected by the district court and another of which was rejected by the court of appeals. Nevertheless, the court upheld the portion of the damage award based on the damage estimate, citing the policy that a violator of the antitrust laws should not profit from its wrongs.

In *National Farmers Organization v. Association of Milk Producers*, 850 F.2d 1286 (8th Cir.1988), the Eighth Circuit relied on *Agrashell* when it held:

> An antitrust plaintiff's damage claim is not, as the appellees suggest, rendered speculative or unreasonable merely because it fails to provide for a specific reduction in the event that allegations of certain unlawful conduct are rejected. In other words, if an antitrust plaintiff alleges that the defendant engaged in unlawful acts A, B, C, and D, and acts C and D are later rejected as a basis for liability, it does not automatically follow that the damage award must be reduced. Rather, if acts A and B support the entire damage award, it must be sustained.... The determination whether the unlawful acts can support the damage claim is largely a factual one.

*Id.* at 1307. Citing its earlier opinion in *Alexander, supra,* the Eighth Circuit stressed the Supreme Court's admonition in *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962), to avoid tightly compartmentalizing the plaintiff's proof. After reversing the order striking the damage study, the Eighth Circuit offered several guidelines for the district court to follow when reconsidering the sufficiency of the damage study on remand. The *Association of Milk Producers* court recognized that although some of the defendants' conduct was lawful when viewed in isolation, it nevertheless formed part of the overall mosaic that constituted the unlawful conspiracy:

> [T]he fact that the appellees' illegal conspiracy was composed of lawful and unlawful conduct so tightly compartmentalized as to make it difficult to determine which portion of the damages claimed were caused by the unlawful conduct should not diminish the recovery. Similarly, the Court should recognize that the harmful consequences of certain unlawful conduct may have been exacerbated by otherwise lawful conduct. In such a situation, the fact that lawful conduct contributed to additional injury should not prohibit recovery for that injury.

850 F.2d at 1307.

In this case, Harkins has established a genuine issue of material fact that the conspiracy was a material cause of his exclusion from the market and the injury he suffered as a result. Consequently, Conant's failure to segregate damages resulting from lawful, as opposed to unlawful exclusionary activities, does not require striking the damage study and dismissing the case.

### 2. Farley Transportation

UATC relies on the Ninth Circuit's decision in *Farley Transportation Co., Inc. v. Santa Fe Trail Transportation Company*, 786 F.2d 1342 (9th Cir. 1985). *Farley* was an antitrust action against a trucking company and railroad by two competitors alleging a conspiracy to fix prices in violation of Sections 1 and 2 of the Sherman Act. The Ninth Circuit ruled that the plaintiffs' two methods of damage calculation were inadmissible because the plaintiff failed "to present *any* evidence permitting the jury to parse out which damages were attributable to the unlawful competition." 786 F.2d at 1351.

The Ninth Circuit excluded the plaintiff's first method of calculating damages because no evidence was produced showing

the number of trailers that were diverted because of illegal price-cutting activities, as opposed to legitimate competition, presuming that all of the plaintiff's shipping business was infected by the unlawful scheme.

The Court ruled that the evidence was inadequate because the study did not take into account the fact that the plaintiffs could have lost customers to their competitor even in the absence of the illegal scheme. According to the Court, the fatal flaw was the failure to present direct evidence concerning the behavior and motivation of the shipping customers as opposed to the shipping competitors; that is, direct evidence as to why customers were attracted to the competitor which would create a reasonable inference as to the amount of customer business diverted to the competitors because of, rather than without regard to, the illegal scheme. 786 F.2d at 1352.

The second method of calculating damages, consisting of a study by an economist, was excluded because the economist admitted that he assumed the fact of antitrust injury; that the lost profits were attributable to the defendants' illegal activities. As a result, the study failed to show any nexus between the alleged conspiracy and the damages allegedly suffered by the plaintiff. *Id.* at 1351.

In this case, there is evidence which will enable the jury to "parse out" which films were lost due to the conspiracy and which films, if any, were lost due to legitimate competition (such as *Midway* and *McArthur*). The parties' dispute over the relative superiority of the two bids for the film *Midway* is an example of the evidence the jury would be able to rely on in determining whether Harkins lost the film due to the defendants' alleged conspiracy or through legitimate competition.

In addition, Harkins has presented "abundant factual support" tending to show a nexus between the alleged conspiracy and the damages suffered as a result of his inability to license first-run movies. *Harkins Amusement*, 850 F.2d at 477.

UATC argues that Conant's damage study does not take into account the fact that Harkins could have lost film licenses to other exhibitors even in the absence of

the illegal scheme. However, there is one fundamental difference between *Farley* and *Harkins*. In this case, the "customers" are alleged to be a part of the illegal scheme.

Applying *Farley* to this case, the fatal flaw would be the failure to provide direct evidence that the distributors were licensing films to the competitor exhibitors because of, rather than without regard to, the illegal scheme. By creating a material issue of fact as to the conspiracy between the individual distributors and the exhibitors, Harkins has presented direct evidence that the distributors licensed the vast majority of first-run films to members of the Phoenix split because of, rather than without regard to, the split's alleged practices of allocating films and rigging bids.

Harkins contends that, absent the conspiracy to exclude competition from the market, he would have been successful in licensing a share of the total number of first-run pictures licensed in the market in direct proportion to his share of screens in the market. Consequently, it follows that he would be entitled to a representative share of the total grosses of those films licensed during the relevant damage period.

The fundamental evidentiary issue behind this argument is Harkins' ability to compete in a hypothetically free market. This is a question of fact to be determined at trial.

If Harkins is able to establish his ability to compete than his market share damage analysis—unlike the damage study at issue in *Farley*—will have created a reasonable inference as to the amount of business diverted to the defendant-exhibitors as a result of, rather than without regard to, the conspiracy to exclude competition for the licensing and exhibition of superior first-run films in the Phoenix market.

### B. Failure to Use Most Reliable Data

Professor Conant relied on "flash grosses" taken from "flash sheets" to assemble his data base of box office revenues for all pictures exhibited at Plitt, Mann, UATC and GCC theaters (except GCC's Metro

Mall theater). He defined "flash sheets" as "charts kept by some of the exhibitor defendants, prepared by staff to informally 'try' orally reported net box office grosses of their own and other exhibitors' theatres."

Where available, a defendant's own flash sheets were used to establish its grosses. Where not available, another defendant's flash sheets were used as an alternative. Professor Conant acknowledged that the flash sheets are "not necessarily reliable" and that "[b]ecause of the nature of such 'records' exhibitors do not rely on flash sheet grosses as an accurate accounting of box office revenues."

■ Although an antitrust plaintiff cannot be required to prove the amount of damages with precision, the plaintiff has an obligation to come forward with the best, most accurate measure of damages that is reasonably available. *Southern Pacific Communications Company v. American Telephone and Telegraph Co.*, 556 F.Supp. 825, 1090 (D.D.C.1982). As Judge Sirica held in *Riss & Co. v. Association of American Railroads*, 190 F.Supp. 10, 18 (D.D.C. 1960), *aff'd on this point*, 299 F.2d 133 (D.C.Cir.), *cert. denied*, 370 U.S. 916, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962):

> In antitrust cases, a party has the burden of furnishing the best available evidence that the subject matter permits, as to what the impact of the claimed illegal conduct was on its business.

*Accord, ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423, 436 (N.D.Cal. 1978), *aff'd sub nom., Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir.1980), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981).

In *Southern Pacific*, the Ninth Circuit noted the Supreme Court's holding in *Bigelow* that a plaintiff may make a reasonable estimate of the amount of damages caused by an antitrust violation only "in the absence of more precise proof." 556 F.Supp. at 1090 n. 336 (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)).

■ In this case, more precise proof was available to Harkins with respect to the grosses used to calculate the market share damage study. UATC argues that the flash sheets relied on by Harkins to establish the grosses for UATC, Plitt, Mann, and GCC theaters are not the best available evidence. Professor Conant, Harkins' damage expert, conceded in the damage study itself that the "flash sheets" are "not necessarily reliable." UATC contends that Conant could have used UATC's own records of its admissions and that the Plitt, Mann, and GCC grosses could have been obtained by subpoena after Harkins settled with these defendants.

Harkins has established that the "flash sheets" for UATC grosses are actually more generous that UATC's own box office records. However, Harkins failed to address in any way the availability of the box office records for the Plitt, Mann, and GCC theaters. In the absence of these records, there is no way for this court to determine whether the flash sheets accurately reflect the actual box office grosses for the Plitt, Mann, and GCC theaters.

Consequently, unless Harkins can establish good cause why he was unable to obtain this material, or establishes that the flash data accurately reflects the actual box office grosses of the theaters in question, the data for these theaters must be removed from the market share damages study.

The removal of these theaters from the data base used to calculate the total superior first-run box office revenues will necessarily reduce the total net admission losses for the entire damage period. However, these theaters should not be removed from the total number of screens that the total box office revenues are divided by to reach the average box office admission grosses.

Such a calculation would not represent a reliable estimate of the actual damages suffered since it would represent an artificially deflated estimate of Harkins' adjusted net loss of expected profits from the box office admissions during the relevant damage period. However, it still represents a just and reasonable estimate of Harkins' damages since there is no danger that a jury would award a figure in excess of his actual damages.

## C. Errors in Methodology

UATC initially listed a number of different objections to errors in the methodology employed by Conant in calculating Harkins' damages in the three different damage studies. In its reply, UATC notes that "[s]ome errors have been partially corrected but not all of them." UATC does not identify which errors were corrected and which errors it still objects to.

However, UATC notes in its reply that, due to space limitations, it will "focus upon the two most significant flaws: the 'expandable gross' hypothesis and Conant's speculative placement of certain pictures in specific theaters." Because UATC does not identify which of its objections have yet to be corrected we will only address those two issues identified in its reply brief as well as the question of the comparability of the theaters used in the yardstick method of damage calculation.

### 1. Market Share Study: Expandable Gross Hypothesis

■ UATC objects to Conant's use of "expandable grosses" in Harkins' market share method of damage calculation which assumes a maximum increase in box office grosses of 30% for periods 1 through 6, and uses actual percentage increase in screens as representing the expected estimated percentage increase in box office grosses for periods 7 through 11. This assumes that demand would have increased to meet the inclusion of Harkins' screens into the first-run market.

According to UATC, Harkins "expandable grosses" hypothesis assumes that for every run of a film at defendant-exhibitor's theater another print would have been licensed to Harkins theater and would have generated an equal gross in an unrestrained market. Conant submitted no evidence in support of this assumption.

Harkins takes exception to UATC's characterization of his expandable gross hypothesis. According to Harkins, the study only estimates that Harkins' theaters on average could be expected to gross as well as the defendants' theaters over the same period of time if they joined the ranks of superior first-run theaters.

Harkins' response to UATC's objection consists of the statement that "Dr. Conant, as an economist and industry expert, is fully qualified to express an opinion on the aggregate box office grosses which would be expected in a free market in which the distributors licensed their films to all qualified exhibitors." [2]

UATC relies on *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir.1988), for the proposition that a damages expert's opinion on the amount of damages suffered may not rest on "unsupported assumptions." *Id.* at 807. However, *McGlinchy* presents an extreme example of a damage study where the fact of antitrust injury, as opposed to the amount of damages, is based on unsupported assumption. *Id.* at 806. In this situation, where the admissibility of the "expandable grosses" hypothesis is at issue, we are dealing with Conant's opinions to the amount of injury rather than the fact of injury.

Significantly, one of the damage studies the *McGlinchy* court criticized as being based on "unsupported assumptions" was prepared by the plaintiff, who the court noted had not been named as a damages expert. Language in the opinion would suggest that a damage expert's opinion does not necessarily have to be supported by facts in order to survive a motion for summary judgment. According to *McGlinchy*, a damage study must "meet the standard that, in the context of a motion for summary judgment, an expert must demonstrate his competence *or* back up his opinion with specific facts." *Id.* at 806 (emphasis added).[3]

Consequently, UATC's objections goes to the weight as opposed to the admissibility of Conant's "expandable grosses" hypothe-

---

**2.** Dr. Conant's deposition indicates that he based his opinion "on the way films are marketed today in Phoenix."

**3.** Federal Rule of Evidence 705 allows an expert to "testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination."

sis. If the jury accepts UATC's argument, the damage calculations can be adjusted to eliminate the expanded grosses. The admissibility of the "expandable grosses" hypothesis does not "pose a great danger of confusing the fact and causes of damages with the amount of damages," which was the stated reason for excluding the damages expert's study in *McGlinchy*. *Id.* at 806.

### 2. Yardstick Method: Comparability of Theaters

■ The yardstick method of damage analysis is a hypothetical measure of antitrust damages which compares sales and profit data for plaintiff's business during the damage period with those of other firms that theoretically were not affected by the defendants' anticompetitive practices.

UATC claims that Conant, in formulating his yardstick method of damage analysis, relied on Harkins' assumptions that his theaters were comparable to the exhibitor defendants' theaters. For example, the Camelview is claimed to be the equal of the Cine Capri and the Los Arcos is claimed to be 90% of the Bethany in earning capacity. UATC argues that the self-serving statements of Dan Harkins are an insufficient foundation for the yardstick method.

Aside from seating capacity, the comparability of any two given theaters would seem to be a question of fact involving the quality of the theaters and their respective geographic locations. Even the issue of seating capacity involves issues of fact since theaters with unequal seating capacity can still be comparable if the larger theater consistently fails to fill all of its seats.

### 3. Picture-by-Picture: Placement of Particular Films in Specific Theaters

■ UATC objects to the picture-by-picture damage analysis on the grounds that it assumes various pictures would have played on various screens at Harkins' five theaters, and that grosses equal to what the defendant theaters actually earned would have been earned by the Harkins' theaters.

The pictures listed in this method are those for which Harkins submitted bids in response to the distributors' bid invitations which were either the only bids submitted, or were superior to the bids offered by the exhibitor who ultimately licensed the films.

Unlike the market share method, the picture-by-picture method is based on damages flowing from the specific film licenses Harkins claims to have been denied as a result of the defendants' conspiracy. Consequently, the damage calculations are based on the assumption that, having either the superior bid or the only bid, Harkins would have been successful in licensing these films absent the defendants' anticompetitive activity.

UATC argues that in a free market, Harkins' bids would not have been the only ones submitted and most likely would not have been superior. Harkins responds that there is enough evidence so that the jury may make a reasonable inference that Harkins would have won these pictures in a free market absent the defendants' anticompetitive activity. A finding that Harkins would have been successful in licensing specific films in a hypothetical market can only be based on speculation. As a result, the picture-by-picture method of damage analysis must be struck.

### III. The Distributor Defendants' Motion for Summary Judgment on Damages

Conant must estimate the box office revenues Harkins would have obtained in an unsplit, fully competitive market and subtract the film rentals that would have been paid in such a market. The distributors argue that Harkins' use of profits from a Phoenix theater is an invalid basis for comparison because these profits are artificially inflated as a result of the split, and therefore do not provide a reasonable estimate of the box office revenues Harkins would have obtained in a free market.

### A. Use of Economic Data From Anti-Competitive Market

■ The distributors are correct that the Ninth Circuit requires plaintiffs claim-

ing market exclusion to prove their antitrust damages by calculating the difference between what the plaintiff could have made in a hypothetical free market and what the plaintiff actually made in spite of the anticompetitive activities.

In *Dolphin Tours v. Pacifico Creative Service, Inc.*, 773 F.2d 1506, 1512 (9th Cir. 1985), the Ninth Circuit discussed what it described as the "tension between the principle that difficulty in proving the amount of damages should not operate to benefit a defendant whose actions have been that proof difficult, and requiring an antitrust plaintiff to anticipate a hypothetical free market in establishing the amount of his injury....":

> ... [W]e conclude that the burden of anticipating this hypothetical market is appropriately placed on antitrust plaintiffs. In projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market such as an unnatural price differential between themselves and their competitors and limited competition from third parties because of the difficulty of entering the market. Such an approach would overestimate the profits an antitrust plaintiff would have made absent the anticompetitive activity and then under the antitrust laws treble this artificially high damage estimate.

The distributors contend that the holding in *Dolphin Tours* is inconsistent with a Fourth Circuit case relied on by Harkins which held that a defendant's anticompetitive financial results may be used as the yardstick in cases where the defendant's restraints on trade prevent the existence of a freely competitive market. *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1142 (4th Cir.1980) (citing *Bigelow v. R.K.O. Radio Pictures*, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946)).

In *Wilder*, an independent motion picture exhibitor brought an antitrust action based on a market split which resulted in his inability to license first-run films. The Fourth Circuit held that where the exhibitor can show that it was excluded from the relevant product market, and it would therefore have been futile to seek pictures allocated by the split, "its damages can be measured by comparing the exhibitor's receipts with the receipts of a comparable theater operated by a participant in the split." 632 F.2d at 1142.

Harkins and the distributors also disagree as to the applicability of *Bigelow v. RKO Radio Pictures, Inc., supra.* Harkins claims that *Bigelow* endorsed a method of motion picture damage calculations which used a comparison of the plaintiff's theater receipts with the earnings of a competitor operating under the advantages of the anticompetitive market. Harkins notes that a second method of damages, involving a comparison of the plaintiff's profits before and after the alleged restraint was also submitted to the jury, and that the jury apparently relied on both methods since their damage award was exactly in the middle of the damage figures computed under both methods of analysis. In upholding the jury's award of damages, the *Bigelow* court noted that both methods of analysis "tended to show damage" and that "[t]hey were not mutually exclusive."

The distributors contend that the sole issue in *Bigelow* was whether an exhibitor illegally excluded from the market could use as a measure of what its box office receipts would have been, the box office receipts of a comparably situated theater owned by a defendant distributor and challenge the applicability of the *Bigelow* decision on two grounds. They note that whether the split agreement artificially depressed film rentals is never discussed in *Bigelow*. While *Bigelow* did not deal with film rental prices, it did expressly endorse the use of anticompetitive financial data where the defendant's illegal conduct prevents a more precise calculation of damages.

A similar argument challenging the use of economic data from an anticompetitive market as invalid was made in *Syufy Enterprises v. American Multicinema, Inc.*, 793 F.2d 990 (9th Cir.1986). In *Syufy*, AMC attempted to prove the damages if suffered in the anticompetitive San Jose market by comparing the profits earned by one of its San Jose theaters with the prof-

its earned by one of its Phoenix theaters. Syufy argued that the use of profits from the Phoenix market was an invalid basis for comparison because these profits were inflated as a result of the illegal conduct of the split active in the Phoenix market.

This argument is similar to the reasoning by the distributors here, who argue that Harkins' use of profits from the Phoenix theater is an invalid basis for comparison because these profits are artificially inflated as a result of the split.

The Ninth Circuit rejected the same argument when it was made in *Syufy*, holding that "[c]omparability is a question of fact.... It was for the jury to consider Syufy's arguments about the effect of the split on the validity of the comparison and to adjust its damage award accordingly." 793 F.2d at 1003.

Admittedly, the facts in *Syufy* are dissimilar to the facts presented here. In *Syufy*, the comparison was being made between two allegedly anticompetitive markets as opposed to theaters within a single restrained market. However, unlike many of the other antitrust cases where a projected market share in a hypothetically free market is entirely speculative, this case deals with known quantities. Harkins' share of the screens in the market would at least have remained the same regardless of the existence of the split, and the same movies would have been licensed and exhibited regardless of the split. There is no reason to believe that the box office revenues would have been significantly different in an unsplit freely competitive market since the distributors have not argued that ticket prices would have increased in a free market.

The only unknown variables in the damage calculations are the film rental prices in a free market, Harkins ability to furnish the guarantees and quality theatres necessary to compete for the licensing of superior first-run films in a free market, and perhaps whether more prints of the same films would have been licensed. These are questions of fact.

**B. Yardstick Method: "Use of Average Theater"**

Additionally, the distributors argue that Harkins' use of the comparable receipts approach is fatally flawed because it does not use a specific comparable theater but instead relies on a fictional "average theater." The distributors argue that this approach was expressly prohibited by the Eighth Circuit in *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 893–96 (8th Cir.1978).

In *Admiral*, the entire comparative theater testimony was based on the grosses of a fictional theater which were determined by putting two existing theaters together (the Astro and the Dundee) and halving the result. The Admiral Theater was then compared against the "Astree." The Court noted that the witness who provided the only testimony offered upon which the jury could find causation and damages was not an expert in theater quality, but relied upon another expert's conclusion that the hypothetical theater would be "comparable" to the Admiral. *Id.* at 894–95.

The distributor overlooks an important distinction between *Admiral* and the situation at issue in this case. In *Admiral*, the "average theater" was being used to form a damage calculation which was the sole evidence of causation as well as of damages. In this case, Dr. Conant's calculations are only being used to determine the amount of injury. *Id.* at 895.

In *Syufy Enterprises, supra,* the Ninth Circuit made a distinction between the use of market comparisons to prove the fact of antitrust injury as opposed to the amount of antitrust injury. The Court noted that "[p]roof of the amount of damages is governed by a less stringent standard of proof than is the fact of injury." 793 F.2d at 1003. As has already been discussed, the *Syufy* court held that "[c]omparability is a question of fact...." *Id.*

**C. Film Rental Calculations**

A linchpin in Conant's damage study is the use of a film rental percentage paid by the Cine Capri—while the theater was participating in the split—to determine

Harkins' film rental costs that should be subtracted from the gross box office revenues in order to calculate his lost profits. The distributors argue that Conant's use of a film rental figure that is artificially depressed as a result of the Phoenix split impermissibly inflates Harkins' profits and is therefore inadmissible.

The distributors object to Conant's 55% figure for average film rentals, which would result in a damage calculation of $3,280,000. The 55% figure is based on the average film rentals paid by the Cine Capri theater between 1974 and 1976. The distributors note that by excluding the year 1977, Conant has excluded the blockbuster Star Wars for which a film rental of 78% was paid. If the year 1977 were included, the average film rental would have been 67% as opposed to 55%.

While it is true that the 55% figure may be artificially deflated as a result of the split, and therefore may not be representative of the average film rental cost for a theater in a hypothetically free market, the 67% figure is probably artificially higher than the average film rental cost incurred by a theater participating in the split which did not show Star Wars. Assuming the 67% figure as representative of the average film rental cost in a hypothetically free market, Harkins would still be entitled to $2,360,000 in damages.

Even if Conant's average film rental figure is unreliable because it reflects the artificially suppressed prices of an anticompetitive market, and excludes from the calculation the film rental paid for Star Wars, it is not entirely speculative. We know, for example, that the average film rental in a hypothetically free market would most likely not have been as low as the 55% figure which gives Harkins the benefits of the artificially suppressed prices of the anticompetitive market. Yet it would be economically irrational to assume that they would have been higher than 75%. This is a range within which the jury can make a reasonable estimate.

IV. *Competitive Reactions in a Free Market: Murphy Tugboat Company*

 The defendants rely heavily on the Ninth Circuit's decision in *Murphy Tug-*

*boat Company v. Crowley,* 658 F.2d 1256 (9th Cir.1981), upholding the trial court's determination that the plaintiff's damage calculation was insufficient to allow the jury to come to a reasonable estimate of damages resulting from the alleged antitrust violations. *Murphy Tugboat* involved a Sherman Act Section 2 claim alleging a boycott by competitors of jobs on which a Murphy tugboat was used, thereby preventing the plaintiff from entering the more profitable segment of the ship assist market, that segment embracing ships of over 14,000 tons and flat tows. 658 F.2d at 1260.

The amount of lost profits was not directly established. An expert testified that, under his assumptions and absent the boycott, Murphy would have made a sufficient profit in the large vessel and flat tow market to bring its total ship work business out of the red and into the black. No evidence was admitted of the dollar amount by which Murphy would have exceeded the break-even point. The only figures submitted as evidence were the plaintiff's losses during the relevant damage period. The expert testified that lost past profits would at least have equaled that figure. *Id.* at 1260.

The success of Murphy's lost profits damage theory depended on a finding that, absent the boycott, Murphy would have obtained a significant share (at least 14%) of the large vessel and flat tow segment of the market. The court found that under the circumstances, where Murphy would not have been able to provide all of the tugs on large vessel and flat tow jobs requiring multiple tugs, a simple projection of Murphy's success in the small vessel market segment into the large vessel and flat tow market was implausible. *Id.* at 1261.

The expert testimony which was the only other evidence bearing on Murphy's projected market share in the large vessel and flat two market depended on what the court determined was an unreasonable assumption that the competitors would not have cut their artificially higher prices in reaction to Murphy's entrance into the mar-

ket. The court found that the jury was left without necessary evidence to determine the impact of boycottless choice by customers who may well consider other reasons for wanting to work with a single tug company on jobs requiring multiple tugs.

The defendants argue that *Murphy Tugboat* is analogous to this case because Dr. Conant's damage study does not take into account the exhibitors' expected competitive reaction to Harkins' entry into the market for superior first-run films, which would have resulted in higher film rentals being paid, and Harkins' inability to compete in the Phoenix market.

Unlike the damage calculations at issue in *Murphy Tugboat,* Harkins' damage study is not based merely on general business losses incurred during the relevant damage period. Instead, Harkins has presented highly specific financial data on the revenues generated by specific films and the average box office grosses of theaters in the relevant market during the relevant damage period. Of course, his damage calculations are based on his ability to show that he was capable of competing with the other exhibitors for the licensing of first-run films so as to obtain a significant share of the first-run market.

*Murphy Tugboat* involved a situation where there were only two competitors in the market, both operating under a single holding company, who were able to charge higher prices in the relevant market segment because of the alleged boycott. In that situation it was likely that the competitors would have responded to Murphy's entry into the market by cutting their prices. The court held that Murphy's damage calculations failed to take this into account in allocating itself a highly speculative share of the large vessel and flat tow market.

Rather than dealing with fixed rates in a two competitor market, this case involves a system of competitive bidding in a multi-competitor market. It is not nearly so likely that the exhibitor defendants wold have been able to consistently underbid Harkins for the licensing of hundreds of first run movies in a freely competitive market. In this case, it is more plausible that, absent the conspiracy to exclude him from the market, Harkins would have been able to license the average number of first-run films the other exhibitors were able to license given the number of first-run films available for licensing the Harkins' share of screens in the Phoenix market.

The ultimate question of whether Harkins would have been able to compete with the other exhibitors in a free market, which involve determinations of the quality of Harkins' theaters and his ability to pay the required guarantees, is a question of fact. In *Murphy Tugboat,* which involved the appeal of a judgment NOV, this question was allowed to go to trial.

### V. *AMC's Motion for Summary Judgment on the Failure to Prove Damages with Admissible Evidence*

AMC's motion was filed prior to the availability of Conant's most recent revision of the damage study. The reasoning applied above to UATC's motion in limine and the distributor defendants' motion for summary judgment challenging the validity and admissibility of the damage study apply equally to AMC's motion for summary judgment to the extent that the issue raised in AMC's motion are not mooted by the most recent revision to the damage study.

### CONCLUSION

Because of the inherent difficult of calculating damages in an antitrust case, the asserted fallibility of an expert's assumptions affect the weight of his testimony, not its admissibility. *Wilder Enterprises v. Allied Artists Pictures,* 632 F.2d 1135, 1144 (4th Cir.1980). As long as a logical basis exists for an expert's opinion and the inadequacies are fully disclosed to the jury, the weaknesses in the underpinning of the opinions, go to the weight and not the admissibility of the testimony. *Jones v. Otis Elevator Co.,* 861 F.2d 655, 663 (11th Cir.1988). Whether this logical basis has been established is within the discretion of the trial judge. *Id.*

Conant's damage study is not so entirely speculative so as to be deprived of any

probative weight. Like the *Dolphin Tours* court, we note that "it is reasonable for us to assume that the survey will not be given to the jury in isolation." *See Dolphin Tours*, 773 F.2d at 1513, n. 7.

While Conant's damage study is subject to discount at trial as a result of the defendants' direct attack and countervailing studies,[4] the trier of fact is entitled to appraise the study in the light of associated and independent opinion evidence. During cross examination the defendants can bring out any problems with the damage study which they believe indicate that the study overestimates the amount of Harkins' profits.

The proper amount of damages awarded lies within the range of all of the evidence as to damages. The jury may not speculate, but, acting upon probabilities and inferences it may base its verdict on a just and reasonable estimate derived from the relevant data. *Bigelow v. R.K.O. Radio Pictures*, 327 U.S. 251, 264, 66 S.Ct. 574, 580, *Id.*

IT IS ORDERED denying United Artists Theatre Circuit's motion in limine except as to the admissibility of the picture-by-picture damage analysis, and the use in the market share damage calculations of the "flash sheets" as evidence of the box office grosses for the Plitt, Mann, and GCC theaters (with the exception of GCC's Metro Mall theater).

IT IS FURTHER ORDERED denying American Multi Cinema's motion for summary judgment on failure to prove damages with admissible evidence.

IT IS FURTHER ORDERED denying the distributor defendants' motion for summary judgment dismissing plaintiffs' claims.

---

**4.** For instance, the defendants have available studies and testimony submitted during the multi-district litigation which go directly to the issue of how much film rental prices could be expected to increase in a free market after the dissolution of the split. Following April 1, 1977, General Cinema ceased splitting in all but one market. Barry Reardon prepared a study for Buena Vista showing the increased film rental now paid by General Cinema since splitting had ceased. In addition, John Louis of Nace testified that since the Phoenix split dissolved, the percentage film rental paid to distributors has increased.